Nos. 25-1055; 25-1079; 25-1080; 25-1081; 25-1082; 25-1083; 25-1084, 25-1118, 25-1132, 25-1133, 24-1144, 25-1509

**IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT**

UNITED STEEL, PAPER, AND FORESTRY, RUBBER, MANUFAC-TURING, ENERGY, ALLIED INDUSTRIAL AND SERVICE WORK-ERS INTERNATIONAL UNION, AFL-CIO, et al.,

*Petitioners,*

v.

U.S. ENVIRONMENTAL PROTECTION AGENCY, et al.,

*Respondents,*

On Petition for Review of a Final Rule of the
United States Environmental Protection Agency

**INITIAL OPENING BRIEF OF PETITIONERS ALLIANCE FOR A STRONG U.S. BATTERY SECTOR, MI-CROPOROUS, LLC, AND PPG INDUSTRIES, INC.**

ERIC P. GOTTING
  *Counsel of Record*
DAVID B. FISCHER
**KELLER & HECKMAN LLP**
1001 G Street, NW
Suite 500 West
Washington, D.C. 20001
(202) 434-4100
egotting@khlaw.com

*Counsel for PPG Industries, Inc.*

DANIEL J. FEITH
  *Counsel of Record*
SAMUEL B. BOXERMAN
KATHLEEN M. MUELLER
JEREMY D. ROZANSKY
HUNDLEY POULSON
**SIDLEY AUSTIN LLP**
1501 K Street, NW
Washington, D.C. 20005
(202) 736-8000
dfeith@sidley.com

*Counsel for Alliance for a Strong U.S. Battery Sector*

(additional counsel listed on inside cover)

STEVEN D. WEBER
  *Counsel of Record*
**PARKER POE ADAMS & BERNSTEIN, LLP**
620 S. Tryon Street, Suite 800
Charlotte, NC 28202
(704) 372-9000
steveweber@parkerpoe.com

*Counsel for Microporous, LLC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................iii

STATEMENT OF JURISDICTION...................................................viii

STATEMENT OF THE ISSUES........................................................ix

STATEMENT OF RELATED CASES ..................................................xi

INTRODUCTION.............................................................................. 1

STATEMENT OF THE CASE ..............................................................5

    A.    Legal Background .................................................................5

    B.    Factual Background..............................................................7

        1.    Trichlorethylene and Relevant Uses ............................7

        2.    Risk Evaluation............................................................11

        3.    Proposed Risk Management Rule..............................12

        4.    Comments on Infeasibility of the Proposed Rule ........16

        5.    Final Rule....................................................................20

    C.    Procedural Background......................................................24

SUMMARY OF ARGUMENT ..........................................................26

STANDARD OF REVIEW.................................................................31

ARGUMENT ..................................................................................32

I.    The Conditions On The Exemptions For Battery Separators And *Teslin* Are Arbitrary And Capricious, Not Supported By Substantial Evidence In the Rulemaking Record, And Contrary to Law. ...............................................................................32

A. EPA's finding that compliance with the WCPP and ECEL is feasible is unexplained and counter to evidence in the record. ..................................................................33

B. EPA's Selection of an Infeasible Interim ECEL and WCPP Violates Section 6(g). ...............................................42

C. EPA failed to consider the alternative exposure limits proposed by commenters and adopted by regulators in the European Union and United Kingdom...........................46

II. The Interim ECEL Violates TSCA Because It Is Not "Consistent With The Best Available Science" And Is Not "Based On The Weight Of The Evidence."......................................48

III. EPA Arbitrarily and Capriciously Limited the Exemption for Battery-Separator Manufacturers to 20 Years. ...........................55

CONCLUSION .................................................................................61

CERTIFICATE OF COMPLIANCE...........................................................63

CERTIFICATE OF VIRUS SCAN ...........................................................64

CERTIFICATE OF BAR MEMBERSHIP .............................................65

CERTIFICATE OF SERVICE...............................................................66

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Gas. Ass'n v. FERC,*
593 F.3d 14 (D.C. Cir. 2010) ............................................................ 48

*Am. Wildlands v. Kempthorne,*
530 F.3d 991 (D.C. Cir. 2008) .................................................... 54, 55

*Ausimont U.S.A. Inc. v. EPA,*
838 F.2d 93 (3d Cir. 1988) ............................................................... 31

*BP P.L.C. v. Mayor & City Council of Balt.,*
593 U.S. 230 (2021) .......................................................................... 43

*Butte Cnty., Cal. v. Hogen,*
613 F.3d 190 (D.C. Cir. 2010) ......................................................... 60

*Chem. Mfrs. Ass'n v. EPA,*
859 F.2d 977 (D.C. Cir. 1988) .................................................... 31, 33

*Cigar Ass'n of Am. v. FDA,*
132 F.4th 535 (D.C. Cir. 2025) ........................................................ 55

*D&F Afonso Realty Tr. v. Garvey,*
216 F.3d 1191 (D.C. Cir. 2000) ....................................................... 36

*Food Mktg. Inst. v. Argus Leader Media,*
588 U.S. 427 (2019) .......................................................................... 43

*Gamefly, Inc. v. Postal Regul. Comm'n,*
704 F.3d 145 (D.C. Cir. 2013) ......................................................... 42

*Genuine Parts Co. v. EPA,*
890 F.3d 304 (D.C. Cir. 2018) ......................................................... 59

*Int'l Ladies' Garment Workers Union v. Donovan,*
722 F.2d 795 (D.C. Cir. 1983) ......................................................... 47

*Khan v. Att'y Gen. of the U.S.*,
979 F.3d 193 (3d Cir. 2020) ...................................................... 43

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S. 29 (1983) ...................................................... 33, 36, 37, 55

*Nat'l Shooting Sports Found., Inc. v. Jones*,
716 F.3d 200 (D.C. Cir. 2013) ...................................................... 46

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*,
494 F.3d 188 (D.C. Cir. 2007) ...................................................... 36

*Sierra Club v. EPA*,
972 F.3d 290 (3d Cir. 2020) ...................................................... 33, 36

*Sinclair Wyo. Refin. Co. v. EPA*,
114 F.4th 693 (D.C. Cir. 2024) ...................................................... 43

*U.S. Sugar Corp. v. EPA*,
830 F.3d 579 (D.C. Cir. 2016) ...................................................... 58

*Vinyl Inst., Inc. v. EPA*,
106 F.4th 1118 (D.C. Cir. 2024) ...................................................... 31, 34

*Wages & White Lion Invs., LLC v. U.S. Food & Drug Admin.*,
16 F.4th 1130 (5th Cir. 2021) ...................................................... 46, 47

**Statutes and Regulations**

Frank R. Lautenberg Chemical Safety for the 21st Century Act, Pub. L. No. 114-182, 130 Stat. 448 (2016) ...................................................... 5

5 U.S.C. § 705 ...................................................... 24

5 U.S.C. § 706(2)(A) ...................................................... 31

15 U.S.C. § 2601(b)(2) ...................................................... 5

15 U.S.C. § 2601(b)(3) ...................................................... 45

15 U.S.C. § 2601(c) ...................................................................... 45

15 U.S.C. § 2602(5) ........................................................................ 5

15 U.S.C. § 2605(a) ................................................................... 6, 44

15 U.S.C. § 2605(a)(1)–(3) .............................................................. 6

15 U.S.C. § 2605(b)(1) .................................................................... 5

15 U.S.C. §§ 2605(b)(3)–(4) ............................................................ 5

15 U.S.C. § 2605(g)(1)(A)–(B) ........................................................ 7

15 U.S.C. § 2605(g)(1)(B) ............................................................... 2

15 U.S.C. § 2605(g)(3) ............................................................... 7, 60

15 U.S.C. § 2605(g)(4) .................................. 3, 7, 26, 28, 32, 42, 44

15 U.S.C. § 2618(c)(1)(B)(i)(I) ...................................................... 31

15 U.S.C. § 2625(h) ........................................................... 3, 6, 48, 49

15 U.S.C. § 2625(h)(1) ............................................................. 6, 50

15 U.S.C. § 2625(h)(2) ............................................................. 6, 51

15 U.S.C. § 2625(h)(3) ............................................................. 6, 50

15 U.S.C. § 2625(h)(4) ............................................................. 6, 50

15 U.S.C. § 2625(h)(5) ............................................................. 6, 51

15 U.S.C. § 2625(i) .................................................................. 3, 6, 48

40 C.F.R. § 751.109 ..................................................................... 44

40 C.F.R. § 751.607 ..................................................................... 44

40 C.F.R. § 751.707 ..................................................................... 44

40 C.F.R. § 751.325(b)(5) ............................................................. 61

40 C.F.R. § 751.325(b)(6) ........................................................ 61

Trichloroethylene (TCE); Revision to the Toxic Substances
Control Act (TSCA) Risk Determination; Notice of
Availability, 88 Fed. Reg. 1,222 (Jan. 9, 2023) ................................. 11

Trichloroethylene (TCE); Regulation Under the Toxic
Substances Control Act (TSCA), 88 Fed. Reg. 74,712 (Oct.
31, 2023) ....................................... 8, 9, 10, 11, 12, 14, 15, 16, 34, 49, 55

Trichloroethylene (TCE); Regulation Under the Toxic
Substances Control Act (TSCA), 89 Fed. Reg. 102,568
(Dec. 17, 2024) .............................................................. *passim*

Delay of Effective Date for 4 Final Regulations Published by
the Environmental Protection Agency Between November
29, 2024, and December 31, 2024, 90 Fed. Reg. 8,254 (Jan.
28, 2025) ...................................................................... 24

Postponement of Effectiveness for Certain Provisions of
Trichloroethylene (TCE); Regulation Under the Toxic
Substances Control Act (TSCA), 90 Fed. Reg. 14,415 (Apr.
2, 2025) ....................................................................... 25

Extension of Postponement of Effectiveness for Certain
Provisions of Trichloroethylene (TCE); Regulation Under
the Toxic Substances Control Act (TSCA), 91 Fed. Reg.
7,401 (Feb. 18, 2026) ........................................................ 25

Extension of Postponement of Effectiveness for Certain
Provisions of Trichloroethylene (TCE); Regulation Under
the Toxic Substances Control Act (TSCA), 91 Fed. Reg.
24,133 (May 5, 2026) ........................................................ 26

**Other Authorities**

EPA, *Implementation of Gold Standard Science,*
https://tinyurl.com/4da9yamc (2025) ...................................... 52

OSHA, *Assigned Protection Factors for the Revised Respiratory Protection Standard*, OSHA 3352-02 2009, https://tinyurl.com/4d4zt5hv (last visited May 12, 2026) ................................15

OSHA, *Office and Training and Education, Industrial Hygiene*, https://tinyurl.com/2e9h6ts2 (last visited May 12, 2026) .......................................14

Achieve, Merriam-Webster Dictionary, https://tinyurl.com/tvaxvnjp (last visited May 12, 2026)...................44

Purpose, American Heritage Dictionary, https://tinyurl.com/2z9jvps2 (last visited May 12, 2026)...................44

# STATEMENT OF JURISDICTION

EPA issued the final rule *Trichloroethylene (TCE); Regulation Under the Toxic Substances Control Act (TSCA)*, 89 Fed. Reg. 102,568, on December 17, 2024. Petitioners Alliance for a Strong U.S. Battery Sector, Microporous, and PPG timely petitioned for review of the final rule on January 3, January 6, and January 21, 2025, respectively. Those petitions, which were originally filed in the Fifth, Sixth, and Third Circuits, respectively, were consolidated in this Court pursuant to the United States Judicial Panel on Multidistrict Litigation's Consolidation Order "MCP No. 193."[1] This Court has jurisdiction under 15 U.S.C. § 2618(a)(1)(A).

---

[1] Also consolidated in this Court were petitions for review filed by Trent Capital Partners and the Missouri Alliance for a Strong U.S. Battery Sector, *see* Nos. 25-1084, 25-1133, two other entities representing the interests of battery-separator manufacturers. Petitioners have been authorized to represent that Trent Capital Partners and the Missouri Alliance for a Strong U.S. Battery Sector do not intend to separately participate in merits briefing because they believe Petitioners adequately represent their interests.

# STATEMENT OF THE ISSUES

Exercising authority granted by the Toxic Substances Control Act (TSCA), the Environmental Protection Agency (EPA) banned the chemical trichlorethylene (TCE), but provided exemptions for the use of TCE to manufacture lead-acid battery separators and *Teslin*. EPA based these exemptions on the grounds that TCE is essential to manufacturing these products and that banning TCE for this use would significantly disrupt the national economy, national security, or critical infrastructure due to the many important purposes these products serve. The issues presented are:

1. Whether it was unlawful for EPA to require, as a condition for invoking the exemptions, that battery-separator and *Teslin* manufacturers achieve a TCE exposure level without substantial evidence that the level can feasibly be attained, thereby preventing the exemptions from "achieving the purposes of" avoiding the significant disruption to the national economy, national security, and critical infrastructure that will result from the ban on TCE. 15 U.S.C. § 2605(g)(4); *see* JA__, __–__[Add-671, 674–92] (ENTEK Comment); JA__–__[Add-1661–73] (Microporous

Comment); JA__[APP120] (PPG Comment); 89 Fed. Reg. 102,568, 102,580–81 (Dec. 17, 2024).

2.      Whether it was arbitrary and capricious for EPA to refuse to consider the battery-separator manufacturers' request that the exposure level for TCE be set at the level adopted by regulators in the European Union and United Kingdom. *See* JA__[Add-684] (ENTEK Comment); 89 Fed. Reg. at 102,580–81.

3.      Whether EPA violated TSCA or acted in a manner that is arbitrary and capricious and not supported by substantial evidence by setting an exposure level for TCE that is not "consistent with the best available science" and is not "based on the weight of the scientific evidence." 15 U.S.C. § 2625(h), (i); *see* JA__–__[Add-676–80] (ENTEK Comment); JA__–__[Add-1661–64] (Microporous Comment); JA__–__[APP104–13] (PPG Comment); 89 Fed. Reg. at 102,580–81.

4.      Whether EPA acted in a manner that is arbitrary and capricious and not supported by substantial evidence when it limited the exemption for battery-separator manufacturers to 20 years based on the unsupported premise that the time frame for developing an alternative to TCE could be expedited to 20 years. *See* JA__–__[Add-1280–81]

(ENTEK Comment); JA__–__[Add-1650–54] (Microporous Comment); 89 Fed. Reg. at 102,586–87.

## STATEMENT OF RELATED CASES

These consolidated petitions for review have not previously been before this Court. Petitioners are unaware of any related cases that have not been consolidated with these cases pursuant to the United States Judicial Panel on Multidistrict Litigation's Consolidation Order "MCP No. 193."

## INTRODUCTION

Petitioners seek review of a narrow aspect of an Environmental Protection Agency rule banning the chemical trichloroethylene (TCE). The rule purports to exempt from the ban certain uses of TCE that EPA found are vital to national security, the nation's economy, and critical infrastructure.[2] Those uses include (i) manufacturing lead-acid battery separators, a component in the lead-acid batteries used in virtually all motor vehicles and much of the military equipment and energy infrastructure in the United States, and (ii) manufacturing *Teslin*, a unique material that is a fundamental component of government-issued passports, secure credentials, driver's licenses, filtration elements and cartridges, and various other essential items. Petitioners either are, or represent the interests of, the three companies that manufacture battery separators and *Teslin* in the United States.

That these uses should be exempt is not disputed. EPA acknowledges that there is no feasible alternative to TCE to manufacture these

---

[2] Unless otherwise noted, all citations to docket entries refer to the entries in the lead case, *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union v. EPA*, No. 25-1055 (3d Cir.).

critical and essential products. EPA thus correctly determined that Petitioners are entitled to an exemption under section 6(g) of TSCA for situations in which compliance with the ban "would significantly disrupt the national economy, national security, or critical infrastructure." 15 U.S.C. § 2605(g)(1)(B); *see* 89 Fed. Reg. 102,568, 102,609–10 (Dec. 17, 2024).

Unfortunately, EPA imposed conditions on the exemption that Petitioners cannot feasibly meet. In the final rule, EPA required Petitioners to comply with a Workplace Chemical Protection Program (WCPP) under which TCE exposure levels must be reduced to 0.2 parts per million (ppm). That exposure level—which the rule calls an "interim Existing Chemical Exposure Limit (ECEL)"—is more than 20 times below the level that can be achieved with state-of-the-art engineering and administrative controls. Thus, to achieve the interim ECEL, Petitioners will have to outfit workers full-time in stringent respiratory personal protective equipment (PPE). EPA admits that respiratory PPE creates health and safety hazards, and the record demonstrates that respiratory PPE cannot feasibly be worn all day, every day, by employees in Petitioners' manufacturing facilities.

The interim ECEL thus violates TSCA's mandate that any conditions imposed on a section 6(g) exemption not prevent "achieving the purposes of the exemption." 15 U.S.C. § 2605(g)(4). EPA never explained *how* it is feasible to comply with the interim ECEL, and substantial evidence in the rulemaking record shows that compliance is *not* feasible. Petitioners will thus be unable to invoke the section 6(g) exemption and will have to shut down their operations in the United States—the very outcome the exemption was intended to avoid.

EPA then compounded its error by failing to consider the battery-separator manufacturers' suggestion that EPA use the 6 ppm exposure level adopted by European regulators under their version of TSCA, a level that has proven to be feasible in battery-separator manufacturing facilities in Europe.

The interim ECEL also violates TSCA's mandate that EPA use scientific information "in a manner consistent with the best available science" and make decisions "based on the weight of the scientific evidence." 15 U.S.C. § 2625(h), (i). In setting the interim ECEL, EPA relied on a study that its own scientific advisory committee criticized as highly flawed. What is more, other researchers have not been able to

replicate the study's finding of adverse impacts at low levels of TCE exposure.

Finally, EPA erred in arbitrarily limiting the exemption for battery-separator manufacturing to 20 years. Manufacturers consistently told EPA that at least 25 years would be necessary given the absence of feasible alternatives and the lengthy process required to identify, test, approve, and implement any substitute. But EPA claimed that follow-up conversations with manufacturers showed the transition could be completed within 20 years—an assertion without support in the record. EPA's reliance on this erroneous factual premise was unlawful.

This Court should hold unlawful and set aside these conditions that undermine Petitioners' exemptions and lack support in the record. To be clear, Petitioners do not challenge the rule's general ban on TCE or seek any relief as to parties other than the three firms covered by the exemptions at issue. Those three firms, however, are undisputedly vital to the nation's security, economy, and critical infrastructure, and EPA erred in imposing conditions on their exemptions that they cannot feasibly meet.

## STATEMENT OF THE CASE

### A. Legal Background

TSCA authorizes EPA "to regulate chemical substances … which present an unreasonable risk of injury to health or the environment." 15 U.S.C. § 2601(b)(2).

As amended in 2016, TSCA sets forth a multi-phase process for the regulation of chemicals: prioritization, risk evaluation, and risk management. *See* Frank R. Lautenberg Chemical Safety for the 21st Century Act, Pub. L. No. 114-182, 130 Stat. 448 (2016). First, EPA must designate chemicals as "high-priority" or "low-priority." 15 U.S.C. § 2605(b)(1). Second, for high-priority chemicals, EPA must complete a risk evaluation to determine whether each high-priority chemical presents an "unreasonable risk of injury to health or the environment" under its particular "conditions of use." *Id.* § 2605(b)(3)–(4); *see id.* § 2602(5) (defining "conditions of use" as the "circumstances … under which a chemical substance is intended, known, or reasonably foreseen to be manufactured, processed, distributed in commerce, used, or disposed of"). Third, if EPA finds that a chemical presents an "unreasonable risk of injury," EPA must promulgate a risk management rule with restrictions "to the extent necessary so that the chemical

substance or mixture no longer presents such risk." *Id.* § 2605(a). The rule may require warning labels, limit the manufacture, sale, and use of the chemical, or even impose an outright ban. *Id.* § 2605(a)(1)–(3).

EPA must base any risk evaluation and risk management rule on the "best available science" and "the weight of the scientific evidence." *Id.* § 2625(h)–(i). In evaluating available scientific evidence, EPA must consider the extent to which the evidence is relevant to and reasonable for EPA's intended use, the clarity and completeness of the documentation of study methods and data, the extent of variability and uncertainty in study results, and the extent of independent verification or peer review. *Id.* § 2625(h)(1)–(5).

Even when EPA determines that the best available science supports imposing risk management measures, EPA may include exemptions for certain important uses of the chemical. As relevant here, under TSCA section 6(g), EPA may exempt a use from the requirements of a risk-management rulemaking if it is "critical or essential" and "no technically and economically feasible safer alternative is available, taking into consideration hazard and exposure," or if "compliance with the [general rule] … would significantly disrupt the national economy,

national security, or critical infrastructure." *Id.* § 2605(g)(1)(A)–(B). EPA must set "reasonable" time limits on exemptions "on a case-by-case basis" and include conditions that "are necessary to protect health and the environment while achieving the purposes of the exemption." *Id.* § 2605(g)(3)–(4). Thus, by its very nature, a section 6(g) exemption will allow activities that present some degree of unreasonable risk, and EPA must ensure that compliance with any conditions on the exemption is feasible.

### B. Factual Background

#### 1. Trichlorethylene and Relevant Uses

TCE is a chemical used in industrial and commercial applications, including to produce lead-acid battery separators and polymeric microporous sheet materials.

Lead-acid battery separators are thin, porous, highly-engineered membranes that provide a barrier between a battery's electrodes and facilitate the ionic conduction batteries need to produce power. *See* 89 Fed. Reg. at 102,586. TCE extracts process oil during manufacturing and produces the separators' required pore structure. *Id.* No substitute for TCE exists for this purpose. *Id.* at 102,586–87.

Lead-acid batteries cannot function without separators. *Id*. at 102,586. And lead-acid batteries are in virtually all automobiles (including electric vehicles), trucks, and emergency vehicles, as well as in military vehicles and other critical infrastructure. *See* 88 Fed. Reg. 74,712, 74,745 (Oct. 31, 2023). There are only two domestic manufacturers of lead-acid battery separators: Petitioner Microporous, LLC, and ENTEK International LLC, a member of Petitioner Alliance for a Strong U.S. Battery Sector, a trade association of battery and battery-separator manufacturers.

TCE is also indispensable to the manufacture of *Teslin*, a unique polymeric microporous sheet material that is a fundamental component of a wide range of critical and essential products, including: (i) government issued passports/e-passports, secure credentials, identification cards, and driver's licenses; (ii) durable labels and tags subject to stringent technical and regulatory requirements, including blood bag labels and chemical drum labels; (iii) energy recovery ventilators; and (iv) filtration elements and cartridges. JA__–__[PPG_Comment__pp.2–3] (PPG Comment); JA__[APP083] (PPG Exemption Request); 88 Fed. Reg. at

74,757; 89 Fed. Reg. at 102,587. As with battery separators, TCE facilitates the removal of process oil used during the production process to create the microporous film. 88 Fed. Reg. at 74,757; JA__[PPG_Comment_p.2] (PPG Comment). While PPG's scientists and engineers continuously evaluate other potential solvents, there is no current substitute for TCE for this purpose, 89 Fed. Reg. at 102,587; JA__[APP084] (PPG Exemption Request), and it would be impossible to manufacture *Teslin* without TCE.

Petitioner PPG manufactures *Teslin* in its plant in Barberton, Ohio, the only facility in the world that produces the *Teslin* substrate. JA__, __[PPG_Comment_pp.3,10] (PPG Comment). *Teslin's* microporous matrix easily adheres to inks, adhesives, coatings, and laminating films, and provides performance benefits like cushioning and insulation. JA__–__[APP085–87] (PPG Exemption Request).

Importantly, *Teslin* is used globally in over one billion secure credentials, including U.S. passports/e-passports, and for over 20 years has been relied on by over 100 high-security government programs across more than 80 countries. JA__[APP079] (PPG Exemption Request). *Tes-*

*lin's* unique characteristics (*e.g.*, flexible, bondable, and tamper-resistant) protect microchips containing essential data embedded in e-passports and other secure credentials, helping ensure the safety of travelers and guarding against crime and terrorism. JA__–__, __–__[APP079–80, 83–85] (PPG Exemption Request). Indeed, *Teslin* is a critical material component for the U.S. Department of Homeland Security's Trusted Traveler's credentials, including Global Entry, SENTRI, NEXUS, and FAST. Moreover, *Teslin* labels, which are non-flammable, play an integral role in protecting employees in the chemical industry by minimizing the risk of a spark causing a fire or explosion in a flammable environment. JA__[APP086]. And *Teslin* enables flawless, secure labeling, sterilization, and traceability of blood bags. *Id.* If *Teslin* were unavailable, it would have significant downstream effects, forcing the redesign of myriad products with lower performing and less secure alternatives.

Notably, TCE's use in manufacturing lead-acid battery separators and polymeric microporous sheet materials accounts for less than 1.7% of TCE production volume. 89 Fed. Reg. at 102,574.

## 2. Risk Evaluation

In 2020, EPA conducted a Risk Evaluation that identified adverse health effects associated with short- and long-term exposure to TCE. As relevant here, the risk evaluation found that chronic inhalation exposure to TCE can cause cancer (liver, kidney, and non-Hodgkin lymphoma) and non-cancer effects (including autoimmunity and developmental toxicity), while acute exposure can cause immunosuppression and developmental toxicity. *See* 88 Fed. Reg. at 74,722. Based on the immunotoxicity effects, EPA determined that TCE presents an unreasonable risk of injury for certain specified industrial, commercial, or consumer uses, including use in manufacturing battery separators and polymeric microporous sheet materials. *See id.*; EPA, *Trichloroethylene (TCE); Revision to the Toxic Substances Control Act (TSCA) Risk Determination; Notice of Availability*, 88 Fed. Reg. 1,222 (Jan. 9, 2023).

In January 2023, EPA issued a revised Risk Evaluation in which it made an unreasonable risk determination for TCE as a whole (rather than making individual unreasonable risk determinations for each condition of use, as it had in 2020). 88 Fed. Reg. at 74,723. In finding that TCE as a whole posed an unreasonable risk to health, EPA relied on the

cancer, immunosuppression, and autoimmunity effects identified in the 2020 Risk Evaluation. *Id.*; *see also* JA__[Revised_Unreasonable_Risk_Determination_at_4] (noting that a whole chemical approach does not "amend… the underlying scientific analysis of the risk evaluation").

### 3. Proposed Risk Management Rule

In October 2023, EPA proposed a TCE risk-management rule that would ban TCE, with a few section 6(g) exemptions. 88 Fed. Reg. at 74,716.

As relevant here, EPA proposed a 10-year exemption for TCE's use in battery-separator manufacturing because "battery separators are essential components of batteries that power vehicles and systems in the U.S. supply chain for multiple critical infrastructure sectors within the national economy," and "there are no feasible alternatives to TCE available" for manufacturing them. *Id.* at 74,716, 74,745–46. Industry stakeholders and federal agencies both confirmed that a lack of domestic production would "leave the U.S. reliant on foreign suppliers to the extent they are available to support the national economy, national security, and critical infrastructure." *Id.* EPA agreed, finding that lead-acid

batteries are "essential to serve critical infrastructure such as transportation systems, security systems, as well as to energize the national defense base (*e.g.*, nuclear submarine batteries)." *Id.* at 74,745. Thus, a ban on use of TCE in battery-separator manufacturing would "significantly disrupt national security and critical infrastructure." *Id.* at 74,746.

Similarly, EPA proposed a 15-year exemption for PPG's use of TCE to manufacture *Teslin*. *Id.* at 74,758. EPA found that *Teslin's* various applications are "critical and essential uses for which no safer alternative is available," and are "important for the national economy, national security, and critical infrastructure." *Id.* at 74,757. EPA also agreed that there are "no feasible alternatives to TCE available at present" for the manufacture of *Teslin* and that compliance with any TCE ban "would be disruptive." *Id.* at 74,757–58.

EPA proposed conditioning the exemptions on the manufacturers' compliance with a TCE WCPP that would limit exposures to an ECEL of 0.0011 ppm measured as an 8-hour time-weighted average. *Id.* at 74,736–38. EPA also proposed an alternative ECEL of 0.0040 ppm. *Id.* at 74,754. EPA further proposed requiring manufacturers to meet the ECEL by

implementing a hierarchy of controls. *Id.* at 74,736, 74,740–41. Under this approach, manufacturers would reduce chemical exposures through, in descending order of preference, engineering controls (*e.g.*, venting chemical fumes away from employees), administrative controls (*e.g.*, prohibiting workers from entering areas where there is an inhalation risk), and finally PPE (*e.g.*, respirators). *Id.* at 74,717; *see also* Occupational Safety and Health Administration (OSHA) Office and Training and Education, Industrial Hygiene, at 3, https://tinyurl.com/2e9h6ts2 (last visited May 12, 2026) (defining engineering and administrative controls). Under EPA's proposal, manufacturers would need to rely on administrative or engineering controls to reduce exposure levels to as near the ECEL as possible, and if manufacturers could not meet the ECEL through those controls, they would need to outfit employees with specified respiratory PPE. 88 Fed. Reg. at 74,717.

The level of proposed PPE related directly to the ECEL. *See id.* at 74,765. For exposure levels 10 times the ECEL, EPA mandated respirators with an assigned protection factor (APF) of 10, meaning they reduced exposures at least tenfold. *Id.* at 74,742. For exposure levels 25

times the ECEL, EPA mandated APF 25 respirators. *Id.* And so on. *Id.* For exposure levels of 1.1 ppm or greater, all employees would have to wear an APF 10,000 full-facepiece self-contained breathing apparatus (SCBA) or supplied-air respirator (SAR). *Id.* at 74,742. Below are OSHA's official illustrations of that equipment[3]:



**SCBA**                    **SAR**

Critically, EPA acknowledged that respirators were not a "long-term, sustainable" solution. *Id.* at 74,765. It explained that some workers cannot wear PPE due to health issues; respirators often do not ade-

---

[3] *See* OSHA, *Assigned Protection Factors for the Revised Respiratory Protection Standard*, OSHA 3352-02 2009, https://tinyurl.com/4d4zt5hv (last visited May 12, 2026).

quately fit workers; PPE can restrict communication, hearing, and movement; and respirators can be intolerable to wear over extended periods. *Id.* at 74,741, 74,764–65. Given these concerns and "the extremely low ppm level of the ECEL," EPA further acknowledged that it "will be infeasible for industry to reliably meet [the ECEL] due to the need for a combination of engineering, administrative controls, and full-face, self-contained, air-supplied respirators." *Id.* at 74,762. EPA did not explain how the proposed WCPP accounted for these concerns.

### 4. Comments on Infeasibility of the Proposed Rule

In comments, Microporous, PPG, ENTEK, and other manufacturers explained that the ECEL in the proposed WCPP was so onerous and unworkable that the section 6(g) "exemptions" existed in name only. *See* JA__–__[Add-674–92] (ENTEK Comment); JA__–__[Add-1661–73] (Microporous Comment); JA__[APP120] (PPG Comment). For one thing, the proposed and alternative ECELs were so low that they could not be reliably measured. JA___[Add-670] (ENTEK Comment); JA__[Add-1688] (Microporous Comment); *see* 88 Fed. Reg. at 74,737 (concluding that "extremely low-ppm levels of TCE" could not be detected to determine compliance with the proposed ECEL).

16

For another, no feasible engineering or administrative controls could enable manufacturers to meet the proposed ECEL. JA___[Add-669] (ENTEK Comment); JA__–__[Add-1667–68] (Microporous Comment); JA__[APP120] (PPG Comment). Manufacturers explained that they have already implemented state-of-the-art engineering and administrative controls to reduce exposures at their plants, and were not aware of additional controls that could reduce exposures below the proposed ECEL. *See, e.g.,* JA__[Add-671] (ENTEK Comment); JA__–__[Add-1320–21] (Industrial Hygienist Report for ENTEK) (describing enhanced engineering controls that decreased TCE area concentrations across a battery-separator plant 2-fold since 2021); JA__[Add-1667] (Microporous Comment) (describing installation of a new assembly line in 2021 "using the newest, best-in-class technology"); JA__–__[APP117–19] (PPG Comment) (describing fully enclosed and negatively pressurized extractor/dryer/oven area such that all TCE process vapors are contained and transported away from workers during normal operations).

Commenters explained that because manufacturers could not meet the proposed ECEL through engineering or administrative controls, workers would have to wear SCBA or supplied-air respirators all day,

17

every day, to comply. Manufacturers demonstrated that this is infeasible. Such respirators are not meant to be worn full-time; create vision, hearing, and communication problems; can create various safety risks; and cannot be worn by many individuals for medical and other physical reasons. JA__[Add-687] (ENTEK Comment); *see* JA__[Add-690] (noting that the European Union's chemical regulator had acknowledged that respirators are "not usually worn for extended periods"); JA__[APP120] (PPG Comment) (noting full-time PPE use "would render performing work impossible" and would cause physiological and psychological stress and ergonomic injuries). Manufacturers warned that given these "objectively intolerable" proposed requirements, they could not retain the employees needed to profitably operate and would need to close their U.S. facilities. JA__ [Add-689] (ENTEK Comment); *see also* JA__[APP089] (PPG Comment).

To avoid having to close their U.S. facilities, battery-separator manufacturers urged EPA to set the ECEL at 6 ppm—the standard recently set by regulatory authorities under the European Union and United Kingdom's analogue to TSCA, the Registration, Evaluation, Authorisation, and Restriction of Chemicals (REACH) regulation.

JA__[Add-684] (ENTEK Comment). As ENTEK explained, under REACH, European and British regulators determined that 6 ppm is "as low a level as is technically and practically possible" for battery-separator manufacturers to achieve. *Id.* (quoting Regulation (EC) No. 1907/2006 of the European Parliament and of the Council (Dec. 18, 2006), Art. 60(4)). The manufacturers also explained that the exemption needs to remain in effect for 25 years—not the 10 years EPA proposed—because of the substantial time needed to identify, develop, and test a technically and economically feasible alternative to TCE, and then retrofit factories and obtain regulatory approval for its use. JA__–__[Add-1280–81] (ENTEK Comment); JA__–__[Add-1650–54] (Microporous Comment).

Similarly, PPG requested that EPA set the ECEL at 5 ppm, which is the company's internal TCE permissible exposure limit. JA___[PPG_Comment_p.15] (PPG Comment); JA__[APP118] (noting PPG's full-shift TCE exposure monitoring results over the past five years have consistently been below this level). Any ECEL substantially below 5 ppm would force PPG's Barberton plant to cease all *Teslin* operations. JA__[APP089] (PPG Exemption Request).

### 5. Final Rule

EPA finalized the Rule on December 17, 2024, and included several "significant changes" from EPA's proposal. 89 Fed. Reg. at 102,579.

*First*, EPA set an "interim" ECEL of 0.2 ppm that exempt manufacturers would be required to meet. *Id.* at 102,580, 102,568; *see id.* at 102,593 (explaining that the term "interim" emphasizes that the ECEL applies only during the exemption period). The interim ECEL is far lower than any occupational exposure limit worldwide, which typically range from 6 to 50 ppm. JA__–__[Add-1682–83] (ACC Comment).

EPA explained that it continues to view 0.0011 ppm as the level "that would fully address the unreasonable risk" of TCE. JA__[RTC_p.6]. But EPA acknowledged that it "is not feasible" to comply with a limit of 0.0011 ppm "over the long term" due to the "significant challenges potentially exposed persons would experience from extensive respiratory PPE use in an occupational setting." 89 Fed. Reg. at 102,580. EPA "recognize[d] the challenges of respiratory PPE," including "communication problems, vision problems, worker fatigue, and reduced work efficiency," as well as the potential to be "so uncomfortable as to be intolerable to the wearer." *Id.* EPA noted that the "high levels of

respiratory protection" required by the proposed ECEL made these risks especially acute. *Id.* at 102,581; *see also id.* (acknowledging that "[r]espiratory protection is considered a last resort because respirators cannot be worn by all persons, are not suitable for all situations, and due to worker discomfort and fatigue, cannot be worn for long periods of time").

EPA asserted that it set the interim ECEL at 0.2 ppm because— supposedly in contrast to the proposed ECEL—this limit is "feasible," "implementable," and "enforceable." *Id.* at 102,580. Emphasizing "feasibility considerations" in particular, EPA claimed the "interim ECEL takes into account significant challenges potentially exposed persons would experience from extensive respiratory PPE use in an occupational setting." *Id.* According to EPA, "the various industries subject to the interim ECEL can meet the interim ECEL with exposure controls that are feasible for owners and operators to implement for potentially exposed persons over a full shift, using engineering controls and, in some instances, respiratory PPE." *Id.* EPA, however, did not explain the basis for this conclusion.

In response to concerns from battery-separator manufacturers, EPA also stated that it "disagree[d] with the premise that full shift respirator use is mandatory" under the WCPP. JA__[Add-106]. But EPA again pointed to no data or other evidence substantiating this claim. Nor did EPA dispute that battery-separator and *Teslin* manufacturers had already implemented state-of-the-art engineering and administrative controls in their manufacturing facilities, yet still had TCE exposure levels an order of magnitude greater than 0.2 ppm.

*Second,* EPA modified the PPE manufacturers would be required to use if they could not meet the interim ECEL through engineering or administrative controls. For exposure levels of 2–5 ppm, the Rule requires use of powered air-purifying respirators (PAPRs) or SARs equipped with a loose-fitting facepiece, helmet, or hood. *Id.* at 102,605. For exposure levels of 5–10 ppm, the Rule requires use of full-face respirators, PAPRs or SARs with a half-mask, or SCBA with a full facepiece, helmet, or hood. *Id.* PAPRs (official OSHA illustrations below) use a battery-powered blower attached to the worker's back to force ambient air through air-purifying elements and to the worker.



**LOOSE-FITTING PAPR**      **HOOD PAPR**

EPA described PAPRs as "SCBA-type respirators," JA__[RTC-91], and, indeed, PAPRs pose many of the same risks to worker health and well-being as SCBAs, *see* JA__–__[Add-1336–37] (Industrial Hygienist Report). Although EPA acknowledged that SCBAs and SARs "could represent an occupational hazard of [their] own due to communication problems, vision problems, worker fatigue, and reduced work efficiency," it said nothing about PAPRs. 89 Fed. Reg. at 102,581.

*Finally*, EPA finalized a 20-year exemption for battery-separator manufacturers, even though it acknowledged that commenters said "more than 20 years may be needed." *Id*. at 102,586. EPA also adopted the 15-year exemption for *Teslin* manufacturing, confirming that such

material offers "critical and essential uses for which no technically and economically feasible alternative is available." *Id.* at 102,587, 102,610.

**C. Procedural Background**

The Alliance timely challenged the Rule in the Fifth Circuit and moved for a stay. No. 25-1083, Dkt. 4. The Fifth Circuit immediately granted a temporary administrative stay of the Rule to allow it to consider the Alliance's motion. No. 25-1083, Dkt. 6.

After the multi-circuit lottery consolidated all challenges to the Rule in this Circuit, the Fifth Circuit transferred the Alliance's petition for review. No. 25-1083, Dkt. 1-5, 1-6. This Court then issued an order on January 16, 2025, leaving the administrative stay in effect so the parties could brief the Alliance and other petitioners' stay motions. Dkt. 5.

On January 28, 2025, EPA delayed the effective date of the rule by 60 days, pursuant to 5 U.S.C. § 705. *See* EPA, *Delay of Effective Date for 4 Final Regulations Published by the Environmental Protection Agency Between November 29, 2024, and December 31, 2024*, 90 Fed. Reg. 8,254 (Jan. 28, 2025).

Thereafter, EPA decided to permit the TCE Rule to go into effect generally, but postponed the effective dates of the conditions imposed on

industries exempted under section 6(g), including the requirement that they comply with the WCPP and interim ECEL. *See* EPA, *Postponement of Effectiveness for Certain Provisions of Trichloroethylene (TCE); Regulation Under the Toxic Substances Control Act (TSCA)*, 90 Fed. Reg. 14,415 (Apr. 2, 2025); EPA, *Extension of Postponement of Effectiveness for Certain Provisions of Trichloroethylene (TCE); Regulation Under the Toxic Substances Control Act (TSCA),* 91 Fed. Reg. 7,401 (Feb. 18, 2026) (discussing EPA's extensions of the postponement). EPA acknowledged that Petitioners "have raised serious questions concerning the validity of the workplace conditions imposed by the final rule's TSCA section 6(g) exemptions for lead-acid battery separator manufacturing and specialty polymeric microporous sheet materials." 90 Fed. Reg. at 14,416.

This Court initially left the stay in place for the parts of the Rule EPA was postponing. Dkt. 53. EPA apprised the Court that EPA did not oppose a judicial stay of those portions of the TCE Rule subject to its postponements, Dkt. 65-1 at 5; *see* Dkt. 52 at 9, and intended to reconsider the Rule, Dkt. 57-1¶ 9. Nevertheless, the Court later lifted the stay and dismissed the stay motions without prejudice on ripeness grounds. Dkt. 88. EPA has since administratively postponed the effective

dates of the conditions imposed on industries exempted under section 6(g) pending completion of judicial review. *See* 91 Fed. Reg. 24,133, 24,134–35 (May 5, 2026).

## SUMMARY OF ARGUMENT

The Court should grant the petitions and vacate both the requirement that Petitioners achieve the interim ECEL to invoke the exemptions and the limitation of the battery-separator manufacturing exemption to 20 years.

**I.** The interim ECEL is unlawful several times over. Although EPA justified it on the grounds that it was feasible for manufacturers to implement, EPA offered no explanation for this conclusion, and the conclusion contravenes the evidence in the record. EPA compounded these errors by refusing entirely to consider reasonable regulatory alternatives.

**A.** Section 6(g) of TSCA requires that any conditions EPA imposes on exempt uses must permit "achieving the purposes of the exemption." 15 U.S.C. § 2605(g)(4). EPA asserted that the interim ECEL satisfies this requirement by "allow[ing] for implementation … feasibility." 89 Fed. Reg. at 102,581. It stated that it "expects" exempt users can meet the interim ECEL through feasible exposure controls and respiratory PPE,

26

and without full-time respiratory PPE use. *Id.*; JA__[Add-106]. But that central justification for the interim ECEL is entirely unsupported. Notwithstanding comments from battery-separator manufacturers and PPG making clear that the interim ECEL would require them to place their workers in onerous respiratory PPE full-time, EPA neither explained nor cited evidence for its belief that the interim ECEL is feasible. EPA's failure to explain the key premise of the interim ECEL is quintessential arbitrary and capricious rulemaking.

EPA's feasibility finding also runs counter to the evidence. EPA recognized that full-time use of "significant" PPE is infeasible because such equipment poses health and safety hazards of its own, including problems with communication, vision, movement, and productivity, and cannot be worn by all workers. But EPA ignored undisputed evidence that battery-separator and *Teslin* manufacturers could meet the interim ECEL only by outfitting their workers full-time in significant respiratory PPE; that the required PPE poses the very problems EPA had recognized; and that compliance with the interim ECEL was therefore infeasible for

battery-separator and *Teslin* manufacturers. EPA's illogical and unsupported feasibility finding separately requires vacatur of the interim ECEL.

**B.** By choosing an infeasible interim ECEL, EPA also violated section 6(g) of TSCA. That provision requires that conditions like the interim ECEL "achiev[e] the purpose of the exemption." 15 U.S.C. § 2605(g)(4). Here, the purpose of the exemptions at issue is to prevent disruptions to national security and the economy by permitting the continued use of a chemical substance essential to vital industries. But the interim ECEL EPA imposed thwarts this purpose by preventing battery-separator and *Teslin* manufacturers from using their exemptions. Because an exemption cannot achieve its purposes if infeasible conditions obstruct it, EPA's conditions violate TSCA and should be vacated.

**C.** The interim ECEL is unlawful for still another reason: EPA failed to consider a significant regulatory alternative. Battery-separator manufacturers proposed setting the ECEL at 6 ppm, the exposure level that regulators in the European Union and United Kingdom have implemented for TCE as the lowest feasible limit. EPA, however, merely nodded at this figure without providing any reasoned analysis for rejecting

it. EPA's complete failure to justify rejecting this alternative independently requires vacatur of the interim ECEL.

**II.** Separately, the interim ECEL violates TSCA because it is neither consistent with the best available science nor based on the weight of the evidence. EPA derived the interim ECEL from a proposed exposure limit that relied on a flawed study assessing drinking-water-based exposure in rats. This "Johnson" study was defective in multiple respects: it failed to run control groups alongside TCE exposure groups, lacked verification of the actual TCE levels in the drinking water, and did not produce conclusions showing a meaningful relationship between the TCE dose and the incidence of cardiac abnormalities in the rats.

It is thus unsurprising that this study's findings have never been replicated—not even by studies designed to do just that. Worse still, EPA admitted these shortcomings yet never credibly explained why the Johnson study qualified as the best available science despite the existence of superior ones. TSCA's best-available-science requirement is meant to prevent precisely this kind of selective reliance.

**III.** EPA also arbitrarily set the length of the battery-separator exemption at 20 years rather than the 25 manufacturers explained was

necessary. Battery-separator manufacturers consistently explained that a 25-year exemption was needed given the time it would take to identify, test, develop, and deploy a substitute to TCE. EPA disputed none of their premises. It acknowledged that no feasible alternative existed despite years of industry effort to develop one. And it recognized that the path to any alternative was long and uncertain. But according to EPA, a 20-year exemption would work because "follow-up conversations" with the manufacturers gave "clarity that timeframes could be expedited." 89 Fed. Reg. at 102,587.

EPA offered no support for that assertion, and there is none. The comment letters and meeting notes that the agency cited do not suggest that battery-separator manufacturers suddenly changed course and thought that 20 years would be enough. And EPA's claim ignores the millions of dollars that the manufacturers have invested—without success—in trying to develop a feasible alternative. Because EPA relied on a factually incorrect and unsupported basis for limiting the exemption to 20 years, its decision is unlawful and should be vacated.

## STANDARD OF REVIEW

The Court must "hold unlawful and set aside" a risk management rule promulgated under TSCA that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A), or "not supported by substantial evidence in the rulemaking record taken as a whole," 15 U.S.C. § 2618(c)(1)(B)(i)(I). The "substantial evidence" standard under TSCA is "more demanding than the arbitrary and capricious test often applied to administrative rulemaking," *Ausimont U.S.A. Inc. v. EPA*, 838 F.2d 93, 96 (3d Cir. 1988), and requires a "searching review of [EPA's] reasons and explanations for [its] conclusions," *Chem. Mfrs. Ass'n v. EPA*, 859 F.2d 977, 991 (D.C. Cir. 1988) (emphasis omitted) (quoting H.R. Rep. No. 1341, 94th Cong., 2d Sess. 55–56 (1976)). To meet this standard, EPA must "identify the facts that underlie its determination" and show such evidence is substantial based on the "the record taken as a whole." *Id.* at 992. "[C]onclusory statements" are not enough. *Vinyl Inst., Inc. v. EPA*, 106 F.4th 1118, 1128 (D.C. Cir. 2024).

## ARGUMENT

### I. The Conditions On The Exemptions For Battery Separators And *Teslin* Are Arbitrary And Capricious, Not Supported By Substantial Evidence In the Rulemaking Record, And Contrary to Law.

Under TSCA section 6(g), any conditions on an exemption must "protect health and the environment while achieving the purposes of the exemption." 15 U.S.C. § 2605(g)(4). EPA acknowledges that to "achiev[e] the purposes of the exemption," any conditions must be feasible to implement. JA__[Add-79]. And EPA claims it is "feasible" for manufacturers to meet the interim ECEL by employing the exposure controls in the WCPP. 89 Fed. Reg. at 102,580.

But for manufacturers of *Teslin* and lead-acid battery separators, that claim is arbitrary and capricious several times over. EPA did not explain what set of controls could feasibly be used to meet the interim ECEL in these industries. That lack of explanation is not surprising, because the record and EPA's own findings make clear that no feasible controls exist. Further compounding the arbitrariness, EPA failed to consider the feasible exposure limits proposed by commenters and adopted by regulators in the European Union and United Kingdom. Whether considered individually or collectively, these errors require that

the exemptions' conditions be set aside as arbitrary and capricious, unsupported by substantial evidence, and contrary to section 6(g).

## A. EPA's finding that compliance with the WCPP and ECEL is feasible is unexplained and counter to evidence in the record.

An agency acts arbitrarily and capriciously when it fails to "examine the relevant data and articulate a satisfactory explanation for its action" or makes a determination that is "counter to the evidence" in the record. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). A "conclusory statement" is not enough. *Sierra Club v. EPA*, 972 F.3d 290, 298 (3d Cir. 2020) (citation omitted). Before a court can accept EPA's conclusion, the agency must "support its conclusion with demonstrable reasoning based on the facts in the record," *id.*, and "*identify* the facts that underlie its determination," *Chem. Mfrs. Ass'n*, 859 F.2d at 992 (emphasis added). EPA's assertion that compliance with the WCPP and interim ECEL is feasible fails that standard.

**1.** In promulgating the Rule, EPA said that it "*expects* that the various industries subject to the interim ECEL can meet the interim ECEL with exposure controls that are feasible for owners and operators

to implement" over "a full shift, using engineering controls and, in some instances, respiratory PPE." 89 Fed. Reg. at 102,580 (emphasis added); *see also id.* at 102,581 ("EPA *expects* that regulated entities may need to make significant, but feasible, changes to current practice" to "reduce inhalation exposures sufficiently" (emphasis added)). But EPA did not explain the basis for that expectation. EPA cited no evidence and provided no explanation of *how* compliance with the interim ECEL and WCPP would be feasible for battery-separator manufacturers and PPG. Such "conclusory statements" that "fail to *explain* the basis" for EPA's finding cannot withstand this Court's "searching substantial evidence review" under TSCA. *Vinyl Inst., Inc.*, 106 F.4th at 1128 (emphasis in original).

EPA's silence is especially striking because the agency knew that feasibility was a problem. In the Proposed Rule, EPA noted that there was "uncertainty" about "feasibility of exposure reductions," 88 Fed. Reg. at 74,733, and invited "comment on the existing practices" and use of "engineering controls, administrative controls, [and] PPE" in the affected industries, *id.* at 74,737. Battery-separator manufacturers and PPG responded that they have *already* implemented robust engineering and

administrative controls, yet TCE exposure levels exceed 2 ppm for most production and maintenance workers. *See* JA__[Add-682] (ENTEK Comment); JA__[Add-1667] (Microporous Comment); *see also* JA___–___, __[Add-1324–25; Add-1336] (Industrial Hygienist Report); JA___[Add-1326] (Table 3.4);[4] JA___, ___[PPG_Comment_pp.11,15] (PPG Comment).

In the Final Rule, EPA adopted a WCPP that requires workers to wear PAPRs or SARs if the measured exposure concentration is between 2 and 10 ppm. 89 Fed. Reg. at 102,605. Because exposure levels generally exceed 2 ppm even with state-of-the art controls, this means that most production and maintenance workers will have to wear such respiratory PPE for their entire shifts. But EPA never explained *why* it is feasible to require workers to wear PAPRs or SARs full-time. Nor did EPA explain what engineering or administrative controls manufacturers could use to reduce TCE exposure below 2.0 ppm so that workers will not have to wear

___

[4] The exposure concentrations in Table 3.4 are parts per million as a 12-hour time-weighted average because ENTEK plant floor workers work three and a half 12-hour shifts per week. JA__, ___[Add-1322, 1326]. Multiplying those exposure concentrations by 1.5 converts them to the 8-hour time-weighted average required by the Rule.

such equipment. EPA simply declared manufacturers "can meet the interim ECEL with exposures controls that are feasible." *Id.* at 102,580.

That approach of declaring the interim ECEL feasible just "because the agency says so" is the epitome of arbitrary and capricious reasoning. *D&F Afonso Realty Tr. v. Garvey*, 216 F.3d 1191, 1196 (D.C. Cir. 2000). The law requires EPA to "justify and explain" its decision, "not simply to adopt it via *ipse dixit* authority." *Sierra Club*, 972 F.3d at 305. And EPA's "lack of explanation" for its feasibility determination is particularly arbitrary because that finding was "an important"—indeed, a critical— "step in the agency's analysis." *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 204 (D.C. Cir. 2007). The agency's failure to justify and explain that determination is sufficient to justify vacatur of the WCPP conditions EPA imposed on the exemptions for battery-separator and *Teslin* manufacturers.

**2.** But that is not the end of EPA's arbitrary decision making: EPA's assertion that it is feasible for battery-separator and *Teslin* manufacturers to comply with the WCPP is also arbitrary and capricious because it is "counter to the evidence" in the record and EPA's own findings that full-time respirator use is infeasible. *State Farm,* 463 U.S.

at 43. This absence of a "rational connection between the facts found and the choice made" by EPA, *id.* (cleaned up), is independently fatal to the Rule.

In adopting the Rule, EPA "recognize[d] the challenges of respiratory PPE." 89 Fed. Reg. at 102,580. As OSHA has found, not all employees can wear a respirator. Respirators may be uncomfortable and "intolerable to the wearer" and may not be used unless the employee passes a medical evaluation. 89 Fed. Reg. at 102,580, 102,605. Respirators may also "hinder vision, communication, hearing, or movement and thus pose a risk to the wearer's safety or health." *Id.* at 102,580. And, critically, "due to worker discomfort and fatigue," respirators "cannot be worn for long periods of time." *Id.* at 102,581. EPA concurred with OSHA on these points. *Id.* at 102,580–81.

Manufacturers of lead-acid battery separators and *Teslin* showed that respirator use in their production facilities presents the risks OSHA identified, making it infeasible for them to operate if workers have to wear respirators all day, every day. *See* JA__[Add-1337] (Industrial Hygienist Report); JA___[PPG_Comment_p.13] (PPG Comment). The "high density of machinery" in the facilities poses "problems of

maneuverability" when all employees are required to wear respirators. JA__[Add-1337] (Industrial Hygienist Report). With a respirator, activities like "climbing ladders" and "performing electrical testing" are "potentially unsafe" and sometimes "impossible." *Id.* Respirators also hinder workers' "peripheral vision," increasing the risk of falls and other accidents. JA__[Add-1338]; *see also* JA__[APP120] (PPG Comment). Respirators impair communication among workers, since they "block facial expressions" and "muffle sound" in a workplace that is already loud. JA__–__[Add-1337–38]. And workers "may not be willing to tolerate the continuous daily burdens of wearing a respirator," leading to "job dissatisfaction" and possible "difficulties in retaining employees." JA__[Add-1338].

EPA neither disputed these comments nor cited any contrary evidence showing that it is feasible to require plant and maintenance workers to wear respirators full-time. Instead, EPA justified the WCPP on the ground that "full shift respiratory use" is not "mandatory" because the WCPP requires manufacturers to use "elimination/substitution" and "engineering controls" to achieve the ECEL "prior to reliance on PPE like respirators." JA__–__[Add-106–07]. But the record demonstrates that

battery-separator and *Teslin* manufacturers cannot meet the interim ECEL through such controls, and thus must rely on full-time respirator use to comply with the WCPP.

To begin with, it is undisputed that battery-separator and *Teslin* manufacturers cannot feasibly meet the interim ECEL through elimination or substitution of TCE. As EPA admits, TCE is an essential component of the manufacturing process for *Teslin* and lead-acid battery separators. *See* 89 Fed. Reg. at 102,586–87. And EPA exempted these manufacturing processes from the Rule's ban on TCE precisely because there are no feasible substitutes. *Id.*

Nor is it possible for battery-separator and *Teslin* manufacturers to meet the interim ECEL with engineering and administrative controls. As explained above, the unrebutted record evidence establishes that manufacturers have *already* implemented state-of-the-art controls and are not aware of additional controls that could materially reduce TCE exposure levels further. *See supra* at 16–17, 34–35. Yet even with these controls, exposure levels for most maintenance and production workers exceed 2 ppm. *Id.* Consequently, the WCPP does, in fact, require full-shift respirator use. *See* 89 Fed. Reg. at 102,605 (describing the various

National Institute for Occupational Safety and Health (NIOSH)-approved PAPRs or NIOSH-approved supplied-air respirator that are "required" if "the measured exposure concentration" is above 2 ppm).

EPA did not dispute the manufacturers' evidence. Quite the opposite: EPA's own cost-benefit analysis projects that virtually all workers who work directly with TCE in battery-separator and *Teslin* manufacturing plants will need to wear PAPRs or SARs because their exposure level is at least 2 ppm—*i.e.*, more than 10 times above the 0.2 ppm interim ECEL. *See* JA__[Add-453] (Table 7-50).

Finally, it is no answer to say that EPA solved the feasibility problem by adopting an interim ECEL that can be met with PAPRs instead of the SCBAs and supplied-air respirators that would have been required to meet the ECELs in the Proposed Rule. Not only does EPA itself describe PAPRs and other PPE suitable for exposure levels above 5 ppm as "SCBA-type respirators," JA__[Add-107], but the record makes clear that PAPRs and similarly protective respirators present many of the same issues as SCBA and supplied-air respirators, particularly when worn full time.

Both types of respirators can interfere with vision and communication by muffling voices and hiding essential visual cues. JA___–___[Add-1336–37] (Industrial Hygienist Report). Both require wearers to exhale against high pressures, inhibiting breathing and risking fatigue, dizziness, and overheating. *Id.* Both have bulky power sources that wearers must carry on their backs, making it difficult or unsafe to navigate tight spaces or perform tasks requiring flexibility. *Id.* Both interfere with "feelings of well-being and cause anxieties (*e.g.*, claustrophobia) and discontent." *Id.* Both can make "eating, drinking, face scratching, nose blowing, [and] eye rubbing" impossible during working hours. JA ___[Add-689] (ENTEK Comment). Both cannot be worn by workers with certain medical or physical conditions. JA ___[Add-1337]. (Industrial Hygienist Report). And both cannot be worn for long periods of time. *Id.*

EPA did not cite any contrary information in the record. Indeed, EPA itself acknowledged "the challenges of respiratory PPE" generally, in terms not limited to high-APF PPE such as SCBA and supplied-air respirators. 89 Fed. Reg. at 102,580; *see id.* at 102,581 (explaining that "respirators cannot be worn by all persons, are not suitable for all

41

situations, and due to worker discomfort and fatigue cannot be worn for long periods of time," without limiting these concerns to high-APF respirators).

Nor did EPA explain why it considers PAPRs feasible when their use presents the same concerns that led the agency to deem SCBA and supplied-air respirators infeasible. EPA's action is "illogical on its own terms" and thus arbitrary. *Gamefly, Inc. v. Postal Regul. Comm'n*, 704 F.3d 145, 148 (D.C. Cir. 2013) (cleaned up). This, too, requires vacating the conditions on the manufacturers' section 6(g) exemptions.

## B. EPA's Selection of an Infeasible Interim ECEL and WCPP Violates Section 6(g).

In addition to acting arbitrarily, EPA violated section 6(g) by imposing infeasible conditions that defeat rather than "achiev[e] the purpose of the exemption" 15 U.S.C. § 2605(g)(4). Congress enacted section 6(g) because it recognized that chemical uses that are integral to national security, the economy, and critical infrastructure may warrant different regulatory requirements than other uses covered by a risk management rule. Yet here, EPA required manufactures of battery-separators and *Teslin* to comply with the same interim ECEL and workplace chemical protection program that applies to non-exempt uses during the transition

42

period until the TCE ban takes effect. *See* 89 Fed. Reg. at 102,571. And because there is no feasible way for Petitioners to comply with those requirements, Petitioners will be unable to invoke the section 6(g) exemption and will need to shut down their operations in the United States—the very outcome the exemption was intended to avoid. TSCA prohibits eviscerating an exemption in that way.

This Court "normally interprets a statute in accord with the ordinary public meaning of its terms." *Khan v. Att'y Gen. of U.S.*, 979 F.3d 193, 198 (3d Cir. 2020) (citation omitted). Statutory exemptions are no exception. They too must be given a "fair reading" and not "arbitrarily constrict[ed]." *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 439 (2019). Indeed, it is "no surprise" that "a law might temper its pursuit of one goal by accommodating others." *BP P.L.C. v. Mayor & City Council of Balt.*, 593 U.S. 230, 239 (2021). "Exceptions and exemptions are no less part of Congress's work than its rules and standards," and their terms must be respected. *Id.* As the D.C. Circuit recently observed, a "statutory exemption cannot swallow the rule, but neither can we read a statute's purposes so broadly as to render the exemption[] superfluous." *Sinclair Wyo. Refin. Co. v. EPA*, 114 F.4th 693, 711 (D.C. Cir. 2024).

EPA said that it imposed the interim ECEL and workplace chemical protection program "to address the unreasonable risk" of exposure to TCE. 89 Fed. Reg. at 102,571.[5] But while section 6(a) instructs EPA to promulgate a rule with requirements to prevent "unreasonable risk," 15 U.S.C. § 2605(a), section 6(g) does not require that an *exemption* eliminate "unreasonable risk." Instead, EPA should impose conditions on the exemption that are "necessary to protect health and the environment" but that also "*achiev[e]* the *purposes* of the exemption." *Id.* § 2605(g)(4) (emphasis added). In other words, EPA must "bring about"[6] the exemption's "aim or goal"[7] of allowing TCE to continue to be used to manufacture products critical for national security or the economy.

EPA paid lip service to this requirement, *see* 89 Fed. Reg. at 102,581, but then flouted section 6(g)'s terms by imposing conditions that

---

[5] WCPPs are commonly used by EPA in risk management rulemakings and have been imposed as section 6(a) requirements in other TSCA risk management rules. *See* 40 C.F.R. §§ 751.109 (methylene chloride), 751.607 (perchloroethylene), and 751.707 (carbon tetrachloride).

[6] Achieve, Merriam-Webster Dictionary, https://tinyurl.com/tvaxvnjp (last visited May 12, 2026).

[7] Purpose, American Heritage Dictionary, https://tinyurl.com/2z9jvps2 (last visited May 12, 2026).

would prevent battery-separator and *Teslin* manufacturers from continuing to use TCE. *Cf.* 15 U.S.C. § 2601(b)(3), (c) (setting forth Congress's intent that EPA exercise its authority under TSCA "in such a manner as not to impede unduly or create unnecessary economic barriers to technological innovation" and to "carry out this chapter in a reasonable and prudent manner"). EPA acknowledged that these manufacturers lack a technically or economically feasible alternative available to TCE. *Supra* at 12–13. The agency also found that battery separators and *Teslin* are crucial products for maintaining national security, critical infrastructure, and the national economy. *Id.* But without a feasible way to comply, the battery-separator and *Teslin* manufacturers will need to cease production in the United States—creating the very harms to national security and the national economy that Congress enacted section 6(g) to avoid. The Rule thus contravenes the text and purpose of section 6(g) by providing an exemption that exists in name only and, as a practical matter, does not give Petitioners an exemption from any requirements of the Rule.

**C.   EPA failed to consider the alternative exposure limits proposed by commenters and adopted by regulators in the European Union and United Kingdom.**

EPA further erred by failing to consider "'significant and viable' and 'obvious' alternatives" to the interim ECEL proposed by commenters. *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013). An agency must not merely acknowledge that alternatives exist but must show it applied "reasoned analysis" in rejecting them. *Wages & White Lion Invs., LLC v. U.S. Food & Drug Admin.*, 16 F.4th 1130, 1139 (5th Cir. 2021). EPA failed to do so here.

In particular, EPA failed to consider battery-separator manufacturers' proposal to set the ECEL at 6 ppm, the exposure limit established by the European Union and United Kingdom regulators implementing REACH, their analogue to TSCA. JA__[Add-684] (ENTEK Comment). ENTEK explained that under REACH, this limit reflected the regulators' determination of the lowest level that is "technically and practically possible," JA__[Add-684] (quoting REACH), and that this limit was indeed feasible for battery-separator manufacturers to meet, JA__–__[Add-683– 84] (ENTEK Comment). Other commenters noted that a survey of occupational exposure limits from 28 national bodies worldwide found that

the vast majority of equivalent limits for TCE ranged from 6 to 50 ppm. JA__–__[Add-1682–83] (ACC Comment).

Even though the proposed 6 ppm ECEL reflected European and British regulators' view of the lowest feasible limit, and even though it reflected the lowest end of occupational exposure limits worldwide, EPA offered no "reasoned analysis" for rejecting it in favor of an interim ECEL of 0.2 ppm. *Wages & White Lion*, 16 F.4th at 1139. *See generally* 89 Fed. Reg. at 102,580–81 (explaining only why the interim ECEL was preferable to the proposed ECELs of 0.0011 ppm and 0.004 ppm). Nor did EPA explain why the factors it supposedly considered—including the "significant feasibility challenges described by commenters" or "the need for a robust, implementable, and enforceable WCPP for conditions of use"— favored 0.2 ppm over 6 ppm or any other proposed alternative ECEL, particularly those already adopted by other regulatory agencies. *Id.* at 102,580.

In sum, EPA provided no "adequate explanation when these alternatives [were] rejected," *Int'l Ladies' Garment Workers Union v. Donovan*, 722 F.2d 795, 817 (D.C. Cir. 1983), and its "passing reference to relevant factors … is not sufficient" to justify its choice among

alternatives, *Am. Gas. Ass'n v. FERC*, 593 F.3d 14, 19 (D.C. Cir. 2010) (cleaned up). These deficiencies independently render the interim ECEL arbitrary and capricious.

## II. The Interim ECEL Violates TSCA Because It Is Not "Consistent With The Best Available Science" And Is Not "Based On The Weight Of The Evidence."

EPA further erred in selecting the interim ECEL by violating TSCA's mandate to use scientific information "in a manner consistent with the best available science" and to make decisions "based on the weight of the scientific evidence." 15 U.S.C. § 2625(h), (i).

In enacting the Rule, EPA reiterated that the proposed ECEL of 0.0011 ppm is based on "data presented in the risk evaluation, which reflects the best available science." 89 Fed. Reg. at 102,580. EPA said that an ECEL of 0.0011 ppm "would fully address the unreasonable risk." JA__[Add-22], but it concluded that it is infeasible to set the ECEL at 0.0011 ppm because, among other things, that level is so low that it cannot be measured with "monitoring measures that are currently available and widely recognized and used," 89 Fed. Reg. at 102,581. So EPA adopted an "interim" ECEL of 0.2 ppm—a level that EPA thought was feasible and would substantially reduce the unreasonable risk that

EPA found to exist above 0.0011 ppm. *Id.* That violates TSCA because EPA's proposed 0.0011 ppm exposure limit (and hence the 0.2 ppm interim ECEL derived from it) is based on a study that is not the best available science and is contradicted by the weight of the scientific evidence.

**1.** EPA's determination that there is unreasonable risk to people from inhalation exposure to TCE above 0.0011 ppm is based on a study of rats known as the "Johnson study" that reported an increased incidence of cardiac defects in fetuses of pregnant rats orally exposed to TCE in drinking water. *See* 88 Fed. Reg. at 74,762; JA__[Add-2393]. Commenters, including toxicologists, demonstrated that the Johnson study is highly flawed and did not use "measures, methods, protocols, methodologies, or models consistent with the best available science." 15 U.S.C. § 2625(h).

*First*, the Johnson study pooled data from rats in different exposure and control groups that were evaluated at different times over a 6-year period. JA__[Add-1408] (Toxicologist Report); *see also* JA___[Add-1328] (Industrial Hygienist Report); JA__[Add-677] (ENTEK Comment); JA__[Add-1662] (Microporous Comment). The failure to run control

groups concurrently with TCE exposure groups is an unreasonable departure from standard practice and creates uncertainty about whether the results stem from undocumented differences in environmental conditions. JA __[Add-1408] (Toxicologist Report); *see also* 15 U.S.C. § 2625(h)(1) (scientific methods should be "reasonable and consistent with the intended use of the information"); *id.* § 2625(h)(4) (EPA must consider "the variability and uncertainty of the information").

*Second*, the Johnson study investigators failed to analytically verify the levels of TCE in the drinking water of the various exposure groups, even though TCE has a high propensity to volatize in the air. JA__[Add-1408] (Toxicologist Report); JA___[Add-1328] (Industrial Hygienist Report); JA__[Add-677] (ENTEK Comment); JA__[Add-1663] (Microporous Comment). As a result, the actual doses of TCE the animals received is unknown, making the study an unreliable basis on which to derive an ECEL. JA__[Add-1408] (Toxicologist Report); *see also* 15 U.S.C. § 2625(h)(3) (EPA must consider the "clarity and completeness" of the documentation of the data and the quality assurance measures).

*Third*, the Johnson study's conclusions also lacked a meaningful "dose-response relationship" between the dose of TCE and the incidence

of cardiac abnormalities observed in the rats, further making the study unsuitable for use in setting an ECEL. JA___[Add-1328] (Industrial Hygienist Report); JA__[Add-677] (ENTEK Report); JA__[Add-1662] (Microporous Comment); *see also* 15 U.S.C. § 2625(h)(2) (information must be relevant to EPA's decision). In one phase of the study, there was no statistical difference in the rate of cardiac abnormalities between two groups of rats given substantially different TCE doses. *Id.* And one group of rats given TCE during pregnancy had no statistically different incidence of fetal cardiac abnormalities than the control groups. *Id.*

*Finally*, and most importantly, the Johnson study's results have not been replicated. JA___[Add-1328] (Industrial Hygienist Report); JA__[Add-678] (ENTEK Comment); JA__[Add-1663] (Microporous Comment); *see also* 15 U.S.C. § 2625(h)(5) (EPA must consider "the extent of independent verification or peer review"). That is not for want of trying. There are 13 studies in the published literature that investigated the effects of TCE on fetal development. The Johnson study is the *only one* to report an association between low levels of TCE and congenital heart defects. JA__[Add-1410] (Toxicologist Report). Relying on the Johnson study, then, contravenes EPA's own understanding of

"replicability" as "fundamental to the scientific method" and the "integrity and precision of specific experiments." EPA, *Implementation of Gold Standard Science* (2025), https://tinyurl.com/4da9yamc.

Of the 12 studies that contradict the Johnson study's results, three in particular (the "Fisher study," "DeSasso study," and "Carney study") show that the Johnson study is not the best available science for setting an ECEL and is contradicted by the weight of the evidence. The Fisher and DeSasso studies are significant because they were specifically designed to reproduce the Johnson study's findings. JA__[Add-1409] (Toxicologist Report). Dr. Johnson even assisted with the DeSasso study. *Id.* But neither study found an association between TCE exposure and congenital heart defects. *Id.*

The Carney study is important because the rats there were exposed to TCE through inhalation, not orally as in the Johnson study. JA__[Add-1409] (Toxicologist Report). The Carney study found no evidence of heart defects in offspring of rats exposed to TCE levels as high as 600 ppm—a level more than 500,000 times higher than the 0.0011 ppm exposure level EPA found to cause an unreasonable risk based on the Johnson study. JA___[SACC_p.64]. EPA's own Science Advisory Committee of Chemicals

(SACC) criticized the Johnson study for the "significant problems" in its "design and execution" and urged EPA to give "greater attention" to the Carney study. JA___, ___–___[SACC_pp.19, 63–64]. The SACC explained that data from inhalation studies like Carney is "preferred" for determining unreasonable risk "because inhalation exposures are most relevant" to conditions of use where people are exposed to TCE through inhalation. JA___–___[SACC_pp.63–64]; *see also* JA___[SACC_p.19]. EPA disregarded that recommendation in using the Johnson study to determine that 0.0011 ppm is the exposure level that creates an unreasonable risk, even as it admitted that there are uncertainties in extrapolating results from a study of oral exposures and using them to determine safe levels of inhalation exposure. JA___, __[Add-2779;_Add-2048].

**2.** In enacting the Rule, EPA said it disagreed with commenters' criticisms of the Johnson study and had already addressed similar criticisms in responding to comments on the 2020 Risk Evaluation. JA___[Add-75]. But in responding to comments on the 2020 Risk Evaluation, EPA *admitted that the Johnson study has significant flaws.* EPA's earlier admissions serve to confirm, rather than refute,

53

commenters' showing that the Johnson study neither is the best available science nor reflects the weight of the scientific evidence.

EPA admitted in the 2020 Risk Evaluation that the Johnson study's failure to have concurrent treatment and control groups "is not standard practice" and is "a significant limitation" of the study. JA___[Add-2753]. EPA admitted that the TCE doses in the Johnson study "were not analytically verified," and that the study's results "have not been confirmed in any other publications." JA__, __[Add-2751, 2394]. And EPA admitted that there is "substantial uncertainty" about the dose-response relationship in the Johnson study and "the relevance of these results to the human general population." JA___, ___[Add-2751, 2754].

In the final Rule, EPA provided no credible explanation of how, in light of these admitted deficiencies, Johnson is "the best available science" for deriving an ECEL—especially in the face of superior studies, such as Carney. A statutory requirement to use the "best available" data prohibits the agency "from disregarding *available* scientific evidence that is in some way better than the evidence [it] relies on." *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 998 (D.C. Cir. 2008) (quoting *Sw. Ctr. for*

*Biological Diversity v. Babbitt*, 215 F.3d 58, 60 (D.C. Cir. 2000)). Yet that is what EPA did here in using the Johnson study to set the ECEL.

## III. EPA Arbitrarily and Capriciously Limited the Exemption for Battery-Separator Manufacturers to 20 Years.

Finally, EPA erred in limiting the exemption for battery-separator manufacturers to 20 years. EPA justified a 20-year exemption rather than the 25-year exemption that commenters requested based on "follow-up conversations with battery separator manufacturers" that supposedly indicated that "timeframes" for developing an alternative to TCE "could be expedited" to 20 years. 89 Fed. Reg. at 102,587. That explanation relies "on a false factual premise," *Cigar Ass'n of Am. v. FDA*, 132 F.4th 535, 540 (D.C. Cir. 2025), contradicts the evidence before EPA, *State Farm*, 463 U.S. at 43, and thus is arbitrary and capricious.

Battery-separator manufacturers have consistently told EPA that they need a 25-year exemption from any risk management rule restricting use of TCE. EPA acknowledged that request in the Proposed Rule, noting one manufacturer's "ongoing" (but as yet unsuccessful) "search for alternatives since 2014." 88 Fed. Reg. at 74,746. The manufacturers' comments reiterated that a 25-year exemption is needed to "ensure adequate time to test and obtain necessary regulatory

approvals for any alternatives to TCE" that may "become available." JA__[Add-671] (ENTEK Comment); *see also* JA___[Add-1650] (Microporous Comment).

In the Final Rule, EPA agreed that lead-acid battery-separator manufacturers need an exemption because there are no feasible alternatives to the use of TCE. 89 Fed. Reg. at 102,587. EPA also agreed that developing an alternative will require a lengthy process, including (1) "identifying and/or developing an alternative"; (2) "sample trials"; (3) "battery testing"; (4) "second level battery testing"; (5) "changing battery separator production lines"; and (6) "testing and production approval processes from battery end users." *Id.* But instead of granting the requested 25-year exemption, EPA limited the exemption to 20 years, claiming that "follow-up conversations" with the manufacturers provided "further clarity that timeframes could be expedited" to 20 years. *Id.*; *see also id.* 102,586 (referencing "substantiative information" received "in follow up meetings").

EPA is mistaken. Neither the comment letters nor meeting notes cited by EPA say that a 20-year exemption is sufficient. *See id.* at 102,586–87.

Begin with the two cited comments from Microporous and the American Chemistry Council. Microporous expressly stated that it "needs a 25-year exemption"—a number based on its estimate of how long it reasonably will take to identify and test an alternative, build the requisite production infrastructure, and obtain regulatory approval. JA__–__[Add-1650–54].[8] (ENTEK, the only other domestic battery-separator manufacturer, requested a 25-year exemption for similar reasons. *See* JA__[Add-699].) The American Chemistry Council's comment, meanwhile, did not even address the length of the lead-acid battery exemption. *See* JA__–__[Add-1677–1722].

The cited meeting notes also do not substantiate EPA's claim. The presentation that ENTEK prepared for its February 2022 meeting with EPA does not mention a timeline for a TCE alternative, instead explaining that the company's continuous research has revealed no feasible options. JA__[EPA-HQ-OPPT-2020-0642-0097]; *see* 89 Fed. Reg. at 102,587, 102,618 (citing February 2022 meeting notes). And EPA's

---

[8] The time for completing these steps can vary, but Microporous estimated that "a reasonable range for the exemption is 22 to 30 years." JA__[Add-1653]. The request for 25 years is on the lower end of that range, and EPA's 20-year exemption is below it.

notes from a more recent meeting with ENTEK further undermine the (unsupported) assertion that ENTEK said 20 years would be enough. Those notes report that "ENTEK repeated information in their public comment, including that the proposed exemption under TSCA section 6(g) for the use of TCE in manufacturing battery separators be lengthened to at least 25 years." JA__[EPA-HQ-OPPT-2020-0642-0687]. EPA's notes of the meeting with Microporous state that the discussion "indicat[ed] that the shortest possible timeframe to transition away from TCE would be 15 years." JA__[EPA-HQ-OPPT-2020-0642-0688]. But that scenario assumes an alternative is found immediately—a "key assumption[]" that EPA needed to but did not "examine and justify." *U.S. Sugar Corp. v. EPA*, 830 F.3d 579, 650 (D.C. Cir. 2016) (citation omitted).

Indeed, that assumption ignores the "decades of research and millions of dollars" Microporous and ENTEK have invested in finding a TCE substitute, to no avail. JA__[EPA-HQ-OPPT-2020-0642-0688]; *see* JA__[Add-1652] (Microporous comment). As Microporous explained, the more realistic scenario is that "it will be another four to six years before a suitable alternative is identified," after which it will take another 15–20 years to complete the multiple levels of testing, customer vetting and

approval, and construction of new manufacturing facilities. JA__[Add-1653]; *see* 89 Fed. Reg. at 102,587 (acknowledging that this "step-wise process is consistent with EPA's understanding of developing and implementing alternatives for other chemicals and uses"). For that reason, Microporous did not agree 15 years was adequate and "repeated" its "request" that the exemption "be lengthened *to at least 25 years.*" JA__[EPA-HQ-OPPT-2020-0642-0688] (emphasis added). EPA "cannot ignore evidence that undercuts its judgment" or "minimize such evidence without adequate explanation," *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018), but that is exactly what EPA did here.

Moreover, that request was consistent not only with ENTEK's but with that of *every* battery manufacturer and battery-related trade association to comment on the proposed exemption. *See* JA__[EPA-HQ-OPPT-2020-0642-0299] (Battery Council International); JA__[EPA-HQ-OPPT-2020-0642-0262] (Surrette Battery Company Limited); JA__[EPA-HQ-OPPT-2020-0642-0236] (Superior Battery Mfg. Co., Inc.); JA__[EPA-HQ-OPPT-2020-0642-0260] (GS Yuasa Corporation); JA__[EPA-HQ-OPPT-2020-0642-0267] (Clarios International Inc.); JA__[EPA-HQ-OPPT-2020-0642-0265] (EnerSys Delaware Inc.); JA__[EPA-HQ-OPPT-

2020-0642-0242] (East Penn Manufacturing Co.); JA__[EPA-HQ-OPPT-2020-0642-0302] (Stryten Energy LLC); JA__[EPA-HQ-OPPT-2020-0642-0289] (Alliance for Automotive Innovation); JA__[EPA-HQ-OPPT-2020-0642-0240] (Concorde Battery Corporation); *see also* JA__[EPA-HQ-OPPT-2020-0642-0298] (request by Rechargeable Battery Association to extend the proposed 10-year exemption). EPA cited no evidence supporting its view that it was "reasonable" to expect both the discovery and successful testing of a TCE alternative within 20 years. 15 U.S.C. § 2605(g)(3). All these comments "in the record fairly detract[] from [the] weight" of whatever sliver of evidence EPA tried pointing to in support of its decision on the exemption's length, rendering the agency's decision unlawful. *Butte Cnty., Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88 (1951)).

In short, EPA's rationale for limiting the exemption to 20 years was factually incorrect. The limitation was arbitrary and capricious, unsupported by substantial evidence, and should be vacated.

# CONCLUSION

For the foregoing reasons, this Court should vacate 40 C.F.R. §§ 751.325(b)(5)(iii) and 751.325(b)(6)(iii), the provisions of the rule requiring battery-separator and *Teslin* manufacturers to meet the interim ECEL as a condition of their exemptions, and § 751.325(b)(5) insofar as it limits the battery-separator exemption to 20 years.

Dated: May 13, 2026

Respectfully submitted,

/s/ *Eric P. Gotting*
ERIC P. GOTTING
  *Counsel of Record*
DAVID B. FISCHER
**KELLER & HECKMAN LLP**
1001 G Street, NW
Suite 500 West
Washington, D.C. 20001
(202) 434-4100
egotting@khlaw.com

*Counsel for Petitioner*
*PPG Industries, Inc.*

/s/ *Daniel J. Feith*
DANIEL J. FEITH
  *Counsel of Record*
SAMUEL B. BOXERMAN
KATHLEEN M. MUELLER
JEREMY D. ROZANSKY
HUNDLEY POULSON
**SIDLEY AUSTIN LLP**
1501 K Street, NW
Washington, D.C. 20005
(202) 736-8000
dfeith@sidley.com

*Counsel for Alliance for a*
*Strong U.S. Battery Sector*

/s/ *Steven D. Weber*
STEVEN D. WEBER
  *Counsel of Record*
**PARKER POE ADAMS &**
**BERNSTEIN, LLP**
620 S. Tryon Street, Suite 800
Charlotte, NC 28202

(704) 372-9000
steveweber@parkerpoe.com

*Counsel for Microporous, LLC*

# CERTIFICATE OF COMPLIANCE

This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

This document complies with the word-count limitation of Fed. R. App. P. 32(a)(7)(B). According to Microsoft Word, it contains 11,454 words, not counting the parts of the document excluded by Fed. R. App. P. 32(f).

Pursuant to Local Rule 31.1(c), the undersigned also certifies that the text of the electronic brief is identical to the text in the paper copies.

/s/ *Daniel J. Feith*
Daniel J. Feith

# CERTIFICATE OF VIRUS SCAN

I certify, pursuant to Local Rule 31.1(c), that a virus scan detection program has been run on the file of the electronic version of this brief and that no virus was detected. The virus detection program is Carbon Black Defense v.3.1.0.100.

/s/ *Daniel J. Feith*
Daniel J. Feith

## CERTIFICATE OF BAR MEMBERSHIP

Pursuant to Local Rule 28.3(d), I certify that I am a member of the Bar of this Court.

/s/ *Daniel J. Feith*
Daniel J. Feith

**CERTIFICATE OF SERVICE**

I hereby certify that on May 13, 2026, I will cause the foregoing document to be electronically filed through this Court's CM/ECF system. I certify that all parties in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Daniel J. Feith*
Daniel J. Feith